**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DRINK LMNT, INC.,<br><br>Plaintiff,<br><br>v.<br><br>LIVE OASIS, LLC, and<br>CORMAC HAYDEN,<br><br>Defendants. | Civil Action No.______________ |

**COMPLAINT**

Plaintiff Drink LMNT, Inc. ("LMNT"), by and through its undersigned counsel, brings this action against Defendants Live Oasis, LLC and Cormac Hayden (collectively, "Oasis" or "Defendants"). As set forth below, this lawsuit arises from Oasis's publication of false, misleading, and defamatory statements about LMNT and its products across the Oasis mobile application, the oasishealth.app website, and a coordinated network of social media accounts. LMNT alleges as follows:

**NATURE OF THE ACTION**

1. Oasis is a fear-driven ratings app built on a simple and cynical formula: be controversial, go viral, and profit. Its founder, Cormac Hayden, publicly declared that he "cracked the code to going viral" through controversy and divisiveness. Oasis repeatedly lied and misled consumers to execute that strategy. And even when Oasis knew that its statements were false and misleading—about LMNT and dozens, if not hundreds, of other brands—it took no steps to correct them. The lies were too profitable.

2. According to Oasis's own public disclosures, the platform has reached more than one billion impressions, accumulated more than 700,000 members, and achieved a top-10 App Store ranking—all on the back of misrepresenting lab tests and misleading consumers about brands they have come to trust. The very day one such false post went viral, Hayden publicly celebrated a "record day" for downloads, posting analytics showing app downloads had more than doubled. When Oasis eventually retracted the false statements, the retraction reached approximately 1% of the audience that had seen the original false claims. Oasis has built a profitable business by exploiting consumers' desire for healthy choices by sowing fear and distrust to drive downloads and revenue.

3. Oasis generates revenue through subscriptions and affiliate commissions—all driven by alarming content about trusted consumer brands. Oasis earns affiliate commissions on the same product pages where it publishes scores, creating a direct financial incentive to publish false and frightening claims about popular brands while steering consumers toward products it profits from recommending. Oasis's own FAQ page simultaneously represents that "[w]e never do paid sponsorships, ads or any type of paid promotion" while also disclosing that "[w]e do add affiliate links to help fund this project." Both statements appear on the same page. The contradiction speaks for itself.

4. Hayden is an Artificial Intelligence "vibe-code" software developer with no scientific training and—by his own public admission—scaled the app faster than he could build any meaningful quality control. What he built instead was a content machine that prioritized virality over accuracy. He chose fear over fact.

5. Oasis discovered early that attacking well-established consumer brands generated far more viral engagement than scoring obscure products. Claiming that alcohol or chips are

unhealthy generates little alarm—consumers already know. But falsely telling consumers that their trusted bottled water or electrolyte brand contains unsafe heavy metals known to cause birth defects and neurological impairment triggers immediate fear, drives downloads and subscriptions, and generates revenue. That is Oasis's business model.

6. LMNT is an electrolyte brand built on a simple promise: to give health-seekers—including athletes, pregnant women, nursing mothers, and people managing specific health conditions—a zero-sugar electrolyte option to support a healthy, whole foods diet and active lifestyle. Millions of health-conscious consumers have made LMNT a daily staple precisely because they trust what is in it and the quality of the product.

7. After attacking many trusted brands, Oasis chose LMNT as its next target. On December 16, 2024, Oasis published false statements across five social media platforms claiming that LMNT contained *seven times* the legal limit of lead. Oasis assigned LMNT—a clean-label electrolyte product with no sugar, no artificial sweeteners, and no seed oils—a score as low as 3/100. Lower than Cheeto Puffs (58/100). Lower than Oreos (40/100). Lower than Lucky Charms Sugar Cookie Dough (52/100). Multiple false posts by Oasis about LMNT appeared across X, Instagram, YouTube, Facebook, and Threads, reaching millions of consumers and generating tens of thousands of likes. Third-party creators amplified the false claims across additional platforms, generating millions of additional views.

8. As a result of Oasis's posts, consumers threw away products they had trusted for years, warned their friends, and spread the false claims further—amplifying Oasis's damage. Pregnant women and nursing mothers contacted LMNT, fearing they had been consuming dangerous levels of lead. Consumers who had trusted LMNT for years publicly announced they

were discarding their products. The damage was immediate, severe, and—as Oasis well knew—very difficult to undo. And Oasis profited handsomely from it.

9. The falsity of Oasis's statements was not a close call. It was not a matter of scientific dispute. And it was not a question of contested methodology. Oasis treated a bulk concentration figure—micrograms of lead per kilogram of powder—as if it were a per-serving dose. It then compared it to a per-serving regulatory threshold, specifically, the California Proposition 65 Maximum Allowable Dose Level ("MADL"), a standard that itself incorporates a *1,000-fold margin of safety* to a "level of exposure that has been shown to not pose any harm to humans or laboratory animals." The correct per-serving dose falls well below even the strictest applicable safety standard in the country. Oasis overstated the lead content of LMNT's products by a *factor of 300*, and assigned LMNT a low score because of it.

10. LMNT's Chief Executive Officer, James Murphy ("Murphy"), publicly identified and corrected the false statements on December 16, 2024. Instead of acknowledging the falsity of its statements and fixing its score, Oasis later worsened it—dropping LMNT to three out of 100.

11. Murphy initiated a sustained direct message thread with Hayden on X in the weeks following the December 16, 2024 posts. Hayden responded, acknowledged Murphy's explanation, and made his first written commitment to update the LMNT listing across the Oasis platforms. He did not.

12. Murphy proposed a Zoom call. Hayden agreed. On January 21, 2025, Murphy spent an hour walking Hayden through the lab report, the unit-conversion math, and the applicable regulatory thresholds. Hayden committed to promptly publish a retraction. He never did.

13. Three weeks after the Zoom call, Hayden sent Murphy the following message via X direct message on February 12, 2025: "Would you agree with the following? Lead found in

LMNT (6g packet) = 0.162 µg/serving. Legal limit = 2.2 µg/day for children and 8.8 µg/day for childbearing women. Health guideline = 0.5 µg/day." The parties agreed on the corrected figures on February 21, 2025.

14. Nevertheless, the false posts stayed up for *15 more months*—and remain to this day. The retraction, when it finally came in May 2026, was published only after Murphy's own public comments about Oasis's lies went viral on social media and the trade press. Oasis then publicly admitted that "a calculation error inflated the heavy metals," and that Oasis's "product grew faster than we could scale our QC process." But they did not correct their abysmal rating of LMNT. Oasis' misleading retraction reached a tiny fraction of the audience of the original false posts.

15. LMNT is one of many brands that Oasis has targeted with the same playbook. Oasis has received dozens, if not hundreds, of calls for correction including cease-and-desist demands from Mountain Valley Spring Water, Lineage Foods, Equip Protein, Angel Acres, the parent company of Celsius energy drinks, and others for substantially similar false posts. Rather than correcting the record when Mountain Valley Spring Water demanded it, Hayden displayed the cease-and-desist letter on camera and called it an attempt by "big water" to silence him. Publicly available records reflect that numerous additional consumer brands have challenged the accuracy of Oasis's product scoring.

16. Consumers are among Oasis's biggest victims. Across more than one billion impressions and nearly one million app downloads, Oasis has misled consumers into discarding products that they had relied on for years. The harm has been particularly acute for pregnant women and new mothers, who contacted LMNT in alarm after seeing false claims that its products contained dangerous levels of lead. Beyond individual consumer harm, Oasis has contributed to a

broader climate of fear and distrust around consumer products—making it harder for health-conscious consumers to know which brands they can actually rely on.

17. Oasis purports to be a scientific and credible source of product information. It is neither. Hayden has repeatedly failed to perform basic unit conversion from a lab report, let alone demonstrate any credible knowledge of physiology or toxicology. Some consumers are catching on. In response to Oasis's post correcting its false statements about LMNT, one consumer wrote: "Finally someone called out Oasis. Thank you. This app is just giving people anxiety." Another wrote: "I downloaded the app and deleted it. Doesn't seem like it should be legal to lie like that." And yet another commented that "Oasis is a scam to sell shit. Their results don't line up with 3rd party testing." Oasis betrays the trust of millions of consumers precisely because it presents its lies as science.

18. This is an action for defamation, trade libel, tortious interference with prospective economic advantage, false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and unfair competition. LMNT seeks injunctive relief requiring Oasis to remove all remaining false content and issue corrective advertising reasonably calculated to reach the audience that received the original posts, together with compensatory damages, punitive damages reflecting Oasis's knowing and malicious conduct, attorneys' fees, and such other relief as this Court deems just and proper.

## THE PARTIES

19. Plaintiff Drink LMNT, Inc. ("LMNT") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Florida. LMNT is a citizen of the States of Delaware and Florida.

20. Defendant Live Oasis, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in California. Upon

information and belief, the sole member of Live Oasis, LLC is Cormac Hayden, a citizen of California. Accordingly, Live Oasis, LLC is a citizen of the State of California for purposes of diversity jurisdiction.

21. Defendant Cormac Hayden ("Hayden") is an individual, upon information and belief, domiciled in California. Hayden is the founder and Managing Member of Live Oasis, LLC, and is personally identified on the Oasis App as the creator of each product score published therein. The oasishealth.app website also states that it is "Created by Cormac Hayden" on each page. For the purposes of diversity jurisdiction, Hayden is a citizen of the State of California.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over Plaintiff's federal claim pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1121, as this action arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.*

23. This Court has subject matter jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy as the federal claim.

24. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states. LMNT is a citizen of Delaware and Florida. Live Oasis, LLC is a citizen of the State of California, and Hayden is a citizen of the State of California.

25. This Court has personal jurisdiction over Live Oasis, LLC because it is organized and exists under the laws of the State of Delaware.

26. This Court has personal jurisdiction over Hayden because he is the Managing Member of Live Oasis, LLC, a Delaware limited liability company, and participates materially in the management of that entity.

27. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Live Oasis, LLC is subject to personal jurisdiction in this District and therefore resides here within the meaning of 28 U.S.C. § 1391(c)(2), and because a substantial part of the events giving rise to the claims occurred in this District, including Live Oasis, LLC's formation and operation as a Delaware-limited liability company and the publication of defamatory statements accessible and accessed within this District.

## FACTUAL BACKGROUND

### A. A Health Brand Targeted by a Fear-Driven Ratings App

28. LMNT manufactures and sells electrolyte drink-mix products in several flavors, including Citrus Salt, Raw Unflavored, Raspberry Salt, Orange Salt, Watermelon Salt, Chocolate Salt, and other varieties. LMNT has built a national customer base among health-conscious consumers—athletes, fitness enthusiasts, pregnant women, nursing mothers, and individuals managing specific health conditions—who buy LMNT specifically because of its beneficial and clean ingredient profile: paleo and vegan friendly, no sugar, no artificial sweeteners or coloring, no seed oils, and no unnecessary additives. LMNT's brand is built on its quality and supporting people's path to health.

29. Oasis operates a product rating website and mobile application known as "Oasis — What's Healthy," available on the Apple App Store and Google Play, as well as the website oasishealth.app. Oasis holds itself out as a platform that scores and rates consumer food, beverage, and supplement products based on laboratory testing and ingredient analysis. Its homepage promise to consumers is direct: "See what's really inside. Instantly uncover contaminants in your food, water, and everyday products, backed by verified lab data." The website states that it is "Created by Cormac Hayden."




30. Oasis advertises itself to users as enabling consumers to specifically make safer, healthier purchasing decisions—relying on Oasis to perform scientific vetting and evaluate scientific studies on what they consume. Users buy products that Oasis rates highly and avoid products it rates poorly. That reliance is the foundation of Oasis's business and the source of the harm this lawsuit addresses. As of the date of this filing, the Oasis App has received 12,000 ratings

averaging 4.8 stars, and by Oasis's own public disclosures has more than 700,000 members, reached more than one billion impressions, and now generates over $442,000 in monthly revenue.

31. Upon information and belief, Hayden is the sole Managing Member of Live Oasis, LLC, and at all relevant times personally directed, controlled, and executed the conduct at issue in this action. Hayden is the developer of record for the Oasis App on both the Apple App Store and Google Play under his personal name. His name appears individually as creator on each of the more than 500,000 product pages published on oasishealth.app.

32. Additionally, upon information and belief, Hayden has no scientific credentials or experience.

33. Upon information and belief, Hayden personally operates Oasis's social media accounts, personally authored and published the false statements about LMNT, personally conducted the January 21, 2025 Zoom call with Murphy, personally drafted the corrected lead math in the February 2025 direct message exchange, and personally issued the May 2026 retractions.

34. Upon information and belief, Live Oasis, LLC has no scientific staff, no Head of Lab Testing, and no operations meaningfully independent of Hayden himself. At all relevant times, Live Oasis, LLC operated as Hayden's personal vehicle for the conduct alleged herein, and Hayden acted both in his individual capacity and as sole Managing Member of Live Oasis, LLC.

35. Notwithstanding Hayden's lack of scientific credentials, Oasis publicly represents that its product scores are "backed by verified lab data," and that the platform is built on science-based analysis. Oasis published scores for more than 500,000 consumer products, including products manufactured by LMNT and its direct competitors in the electrolyte and sports nutrition markets.

36. Oasis monetizes its platform in part through affiliate commissions on products it scores and recommends, earning revenue when consumers it influences purchase products from Oasis-affiliated sellers.

37. LMNT has established itself as a leader in the powdered electrolyte category. As such, the false "news" by Oasis of heavy metals created substantial buzz and visibility for its platform. By suppressing LMNT's scores and publishing false negative content about LMNT's products, Oasis generates millions of clicks and views that translate directly into app downloads, subscriptions, and affiliate revenue.

38. In addition to a premium subscription, Oasis also earns affiliate revenue from Amazon referral links embedded on LMNT's own product pages—meaning Oasis profits from every click its alarming content about LMNT generates, whether the consumer ultimately purchases LMNT or a competing product. The financial incentive is structural: the more divisive and controversial the claim, the more clicks it drives, and the more revenue Oasis earns.

**B. Oasis's Business Model: Controversy Drives Downloads, Downloads Drive Revenue**

39. Oasis is a commercial enterprise with an estimated monthly recurring revenue of approximately $442,000 by April 2026. Hayden has publicly described Oasis's growth strategy in terms of its financial performance, stating publicly that "downloads skyrocketed since posting here"—in reference to controversial content published on X and other social media platforms within approximately 48 hours of posting the LMNT content.

40. As explained above, a central component of Oasis's revenue model is affiliate commissions. Oasis's own FAQ page states: "We do add affiliate links to help fund this project and to help direct people to where to buy each product." Through this model, Oasis earns financial

compensation when consumers it influences purchase products through Oasis-affiliated links. Oasis's product scores are therefore not commercially neutral.

41. On the same FAQ page on which Oasis discloses its affiliate revenue model, Oasis simultaneously represents: "We never do paid sponsorships, ads or any type of paid promotion."

42. These two representations are irreconcilable. An affiliate commission model is, by definition, financial compensation conditioned on consumer purchasing behavior. Oasis does not disclose this conflict of interest to consumers who rely on its product scores as objective and science-based evaluations.

43. Oasis does not generate revenue by scoring obscure products. It generates revenue by publishing alarming scores about popular, widely trusted brands—brands like LMNT—because consumers who see a frightening claim about a product they already use are the most likely to download the app to check what else they have been consuming. Every alarming score about a well-known brand is, for Oasis, a customer acquisition tool. Downloads generate subscription revenue. Downloads, views, and likes generate affiliate commissions. The more alarming the score, the more viral the post, the more downloads it drives, and the more revenue Oasis earns, all at the expense of the brand that it has falsely maligned. Hayden said so himself, bragging about a 66% download spike driven by controversial content on social media the day before publishing the false LMNT posts, demonstrating that he knew exactly what he was doing:




44. A publicly indexed Reddit thread from the same period as Oasis's false statements about LMNT described Oasis's business model approvingly as follows: "What makes this so powerful is how the content strategy creates a perfect loop: viral Reels → app downloads → affiliate revenue → funding for more content."

45. The false posts about LMNT were not an aberration; the posts reflected Oasis's business strategy—one Oasis had already applied against Mountain Valley Spring Water and other brands before turning it on LMNT.

46. Hayden has also publicly described his content strategy in his own words: "Cracked the code to going viral." His formula for growth: be "controversial" and "divisive."


Posts Replies Highlights Media

Cormac @cormachayden_ · 6d

Cracked the code to going viral.

1b+ impressions, 148k followers, 355k shares—no ads

Why you're not growing:
- Not controversial
- Unclear POV
- Looks like an ad
- Trying to please everyone
- Not shareable
- Inconsistent narrative

What does not matter:
- Music
- Captions
- Hashtags

How to win:
- Be divisive, but authentic
- Stay organic—no ads
- Build human connection
- Create your own category

Keep creating, let's break the algo

**C. December 16, 2024: Oasis Sounds a False Alarm Across Five Platforms, Reaching Millions**

47. On December 16, 2024, Oasis published a coordinated series of posts across at least five platforms: X (@oasiswaterapp), Instagram (@oasiswaterapp), YouTube (@oasiswaterapp), Threads (@checkoasis), and the Oasis App's Facebook page. These posts falsely asserted that LMNT's products contained dangerous levels of lead. The posts were published simultaneously and in materially identical form across all platforms.

48. The posts asserted that LMNT's unflavored option contained "7 times the recommended limit" of lead. The posts further stated that "[t]ests revealed 27 ppb of lead in

LMNT's unflavored options," and warned consumers that lead "increase[s] risks of cognitive impairment" and "causes developmental issues."[1]




49. These statements were false. No test revealed that LMNT's Raw Unflavored electrolyte powder contained "7 times the recommended limit" of lead. In fact *the very test cited here* shows LMNT testing well below the most stringent guidance levels in the country. The figure

[1] The "view" count reflected in Oasis's December 16, 2024 post was captured shortly after publication. According to LMNT's records, views increased substantially in the hours and days that followed. Indeed, many of Oasis's posts ultimately generated over 2.5 million views. This figure also reflects only one of the many platforms across which Oasis simultaneously spread its false statements.

Oasis cited—27 ppb—reflects a bulk concentration measurement, not a per-serving dose, and bears no relationship to the per-serving regulatory thresholds Oasis cited.

50. The posts spread rapidly and reached millions of consumers. Third-party accounts with substantial followings amplified the false claims across X, Instagram, and TikTok. Content using Oasis's audio and framing was reproduced by at least 11 third-party creators, generating approximately 2.15 million additional views—each repeating the false lead claim to new audiences who had no reason to doubt an app that promised to tell them what was really in their food.

51. Among those who amplified the posts was Will Nitze, co-founder and CEO of IQBAR, a health-focused protein bar brand positioned around brain nutrition. Nitze has a substantial following. Upon being confronted by Murphy about the falsity of the statements later that same day, Nitze publicly retracted his post within minutes—demonstrating both the speed with which the false claims spread and the ease with which their falsity could be identified upon even minimal scrutiny.

52. Since the publication of the false social media posts, Oasis revised LMNT's score on the Oasis App and oasishealth.app. LMNT's score, which had previously been 50/100, was lowered to 3/100, highlighted in orange, characterized as "containing 4 harmful substances" with associated inaccurate lab results—numbers that, as Oasis itself would later concede in writing, was the product of inflated and inaccurate data.

53. The false posts and the revised in-app score caused immediate and widespread consumer panic and damage to LMNT's brand that persists to this day. Consumers believed what they read and spread the word. They had every reason to: Oasis had positioned itself as a trusted scientific authority, and its posts carried the imprimatur of laboratory testing and verified data.

Consumers who viewed the posts were falsely led to believe that LMNT's products posed serious health risks, including cognitive impairment and developmental harm.

54. The consumer reaction was deeply personal, and consumers contacted LMNT directly with alarm. One customer warned: "I am part of a group for POTS with 90,000 members and I am going to have to share the news with them." Another reached out simply to ask: "People have been telling me there's lead in the LMNT I bought and have been consuming?" The fear was most acute among pregnant women and new mothers. One breastfeeding mother wrote: "I drank these everyday all throughout my pregnancy and after while breastfeeding and I'm quite anxious and worried about it now." A health practitioner who had recommended LMNT to her clients and used it throughout her own pregnancy wrote: "I feel completely betrayed. I used your product all through my pregnancy and first year of breastfeeding, and feel as though my son has been affected by your mistake." Another customer asked simply: "Have I been poisoning me and my family for the last 3+ years?"

55. LMNT also suffered harm from promotional partners as well; a prospective sponsorship partner declined to move forward after its team "encountered some concerns regarding claims that LMNT may contain lead," citing those false claims as the reason for withdrawal.

56. That consumer reaction is precisely what Oasis's business model requires. Oasis generates revenue through app subscriptions, affiliate commissions, and platform engagement—all of which are driven by alarming (and often false) content about trusted consumer brands. The more frightening the claim, the more downloads it generates, the more subscriptions it converts, and the more affiliate clicks it drives. The false posts about LMNT alone generated, upon information and belief, thousands of likes and more than a million views across all of Oasis's platforms, translating directly into app downloads and revenue for Oasis at LMNT's expense.

57. The false content remained accessible on the Oasis App and across Oasis's social media platforms continuously from December 16, 2024, through the misleading retractions on May 21 and 22, 2026—a period of approximately 17 months. And, as set forth below, the false content continues to be accessible in materially false form as of the date of this filing.

**D. Not a Scientific Dispute—Oasis Made Statements That It Now Admits Were False**

58. The figure Oasis cited—27 ppb of lead in LMNT's unflavored products—reflects a bulk concentration measurement expressed in micrograms per kilogram of powder, not a per-serving dose. Oasis treated this concentration figure as if it were a per-serving dose and compared it directly to per-serving regulatory thresholds, a comparison that is scientifically invalid.

59. The correct per-serving lead dose is calculated by multiplying the bulk concentration by the serving size. LMNT Raw Unflavored is sold in 3.5-gram stick packs. Applying the standard unit conversion (27 micrograms per kilogram multiplied by 3.5 grams per serving, divided by 1,000 grams per kilogram) yields a per-serving dose of 0.0945 micrograms.

60. A per-serving dose of 0.0945 micrograms is approximately 19% of the California Proposition 65 MADL for lead—the strictest regulatory standard in the country. The MADL itself incorporates a 1,000-fold margin of safety, set at a level that California acknowledges has been "shown to not pose any harm to humans or laboratory animals"—what California itself calls "an ample margin of safety."[2]

[2] *See* California Office of Environmental Health Hazard Assessment, *Proposition 65 in Plain Language* (Aug. 1, 2017), https://oehha.ca.gov/proposition-65/general-info/proposition-65-plain-language ("For chemicals that are listed as causing birth defects or reproductive harm, the 'no observable effect level' is determined by identifying the level of exposure that has been shown to not pose any harm to humans or laboratory animals. Proposition 65 then requires this 'no observable effect level' to be divided by 1,000 in order to provide an ample margin of safety.").

61. LMNT's products contain lead at a per-serving dose that is, on correct calculation, well within applicable regulatory thresholds by a substantial margin.

62. The false statements that Oasis made are not a matter of contested scientific methodology or professional disagreement. The conversion from bulk concentration to per-serving dose requires only multiplication by the serving size in grams, a calculation visible on the product label. No toxicological expertise, laboratory access, or specialized training is required to perform it correctly.

63. The elementary nature of Oasis's false statements is corroborated by the fact that a third-party consumer with no association with LMNT identified and publicly posted the same unit-conversion correction in the comment section of Oasis's own Instagram post within days of publication. That commenter noted in plain language that the figure Oasis cited was a concentration measurement rather than a per-serving dose, and that the correct conversion produced a figure well within applicable safety thresholds. Oasis did not acknowledge or respond to this correction.

64. Oasis's claim that lead at the levels present in LMNT's products causes cognitive impairment and developmental harm is independently false and misleading. The health effects Oasis attributed to lead are associated with chronic exposure at levels orders of magnitude higher than those present in LMNT's products. Based on the CDC and Lead Exposure and Prevention Advisory Committee ("LEPAC")[3] data establishing a no-impact blood lead level of 3.5 micrograms per deciliter, a consumer would need to ingest approximately 1,458 micrograms of lead to approach that threshold—representing a margin of safety of approximately 15,000 times

[3] Perri Zeitz Ruckart et al., *Update of the Blood Lead Reference Value — United States, 2021*, 70 MMWR Morbidity Mortality Wkly. Rep. 1509 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8553025/.

the per-serving lead content of LMNT's products. This calculation does not even account for the low bioavailability of naturally occurring heavy metals in soil-based sources, compared with the more bioavailable forms of lead that leach from old pipes—the primary source of concern underlying these regulatory standards.[4] To publicly associate a product at a 15,000-fold margin of safety with birth defects and neurological impairment is not a scientific characterization. It is a false statement of fact.

65. Oasis also did not present its heavy metals claims with the context necessary for consumers to make informed decisions. Trace amounts of lead occur naturally in soil and are present in common foods—leafy greens, cabbage, nuts, rice, and broccoli among them—at levels that meet or exceed the California Proposition 65 MADL.

66. On information and belief, the underlying lab report on which Oasis purported to rely was not linked in the social media posts and was not otherwise accessible to consumers who encountered them. As such, most readers had no ability to independently evaluate the 27 ppb figure, examine how Oasis had applied it, or identify that Oasis had compared a bulk concentration measurement to a per-serving regulatory threshold.

**E. LMNT Corrects the Record, Oasis Agrees, But the False Statements Stay Up**

67. LMNT provided Oasis with notice of the false statements and demanded correction through four independent channels in the days and weeks that followed publication. Across all four channels, Oasis either engaged without ever delivering the promised correction or failed to respond at all.

---

[4] Env't Prot. Agency, Basic Information about Lead in Drinking Water (2026), https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water.

68. On December 16, 2024, prior to the public exchange later that day, Murphy sent Oasis a direct message via Instagram seeking to address the false claims. That outreach went unanswered.

69. Later that same day, Murphy posted a detailed public correction directly in the comment section of Oasis's own Instagram post. Murphy's correction identified the false statements, walked through the applicable math, and cited the relevant regulatory framework.

70. Rather than acknowledge the correction, Oasis publicly doubled down. Murphy responded with a second public comment stating: "It's not just misinformation, you are exhibiting gross negligence and actively terrorizing people."

71. Oasis's only public response was to state that it would consider "more updated reports" if LMNT provided them—an admission that Oasis had not independently verified the data underlying its claims.

72. Following Oasis's public doubling-down, Murphy initiated a direct message thread with Oasis on X, which remained the primary written channel of communication through February 2025.

73. On January 14, 2025—*almost one month later*—Oasis responded to Murphy's X direct messages, acknowledging receipt of Murphy's "full explanation" and committing in writing: "Will review asap and work to update the info accordingly." This was Oasis's first written acknowledgment of Murphy's explanation and its first written commitment to review and update the LMNT listing.

74. Murphy proposed a Zoom call on January 15, 2025. Oasis did not respond for five days. On January 20, 2025, Murphy followed up, referencing prior episodes of non-response. On January 21, 2025, Oasis agreed to a call and provided Hayden's email address.

75. On January 21, 2025, Murphy and Hayden spoke on a one-hour Zoom call. During the call, Murphy walked Hayden through the lab report, the unit-conversion math, the per-serving dose computation, and the applicable regulatory thresholds. Hayden committed during the call to promptly publish a retraction of the false posts. He did not.

76. Later that same evening, Hayden sent a second written commitment via X direct message: “Thanks. Will review and update asap.”

77. On January 24, 2025, Murphy executed his end of the oral commitment by emailing Hayden at the email address Hayden had provided, copying LMNT’s General Counsel and General Manager, Jeffrey B. Brams, Esq. (“Brams”). Brams replied the same day and confirmed his availability for a follow-up call.

78. On February 4, 2025, Brams again emailed Hayden directly to schedule a call. Hayden did not initially respond. Brams made additional follow-up attempts over the following months. After multiple attempts, a call was finally scheduled and took place on May 30, 2025.

79. The May 30, 2025 call was Hayden’s third direct acknowledgment of the falsity of the lead claims. During the call, Brams explained that trace amounts of heavy metals, including lead, occur naturally in soil, and advised Hayden that the subject has been extensively reviewed for decades, with naturally occurring levels acknowledged by the California Attorney General’s Office establishing safe-harbor limits. Hayden stated that he was completely unaware of these facts and of the existence of any such documented evidence. Brams and Hayden again addressed Hayden’s errant unit-conversion math. Hayden indicated familiarity with the unit-conversion issue from his prior exchanges with Murphy. Hayden agreed to conduct his own research on both the presence of naturally occurring heavy metals, including lead, in soil and the correct methodology for performing the per-serving dose calculation. Brams offered to introduce Hayden to laboratory

professionals and specifically referred him to a prominent laboratory director. The parties agreed to schedule a follow-up call.

80. On June 16, 2025, Brams asked Hayden for a follow-up call to address the outstanding issues with Oasis's published content about LMNT. Hayden did not respond until July 1, 2025, when he proposed a call on July 4 or 5, 2025.

81. Brams replied on July 1, 2025, with a detailed written communication asking Hayden to address, among other things, how Oasis had arrived at the framing that LMNT's products contained "25% of the daily guidelines" for lead, and specifically whether that framing improperly implied to Oasis's followers that 0.5 micrograms per serving was a daily guideline for total lead consumption rather than a Prop 65 notification threshold applicable to naturally occurring lead in individual products. Brams also asked Hayden to follow up on their prior discussion of lead in mineral sources. On July 4, 2025, Hayden agreed to speak the following Tuesday.

82. Across all four channels of notice—public Instagram comment, direct message thread, Zoom call, and formal General Counsel email—Oasis received detailed, repeated, and unambiguous notice that the lead claims were false, that the underlying data had been misapplied, and that LMNT was demanding correction.

83. Oasis made three written commitments and two oral commitments to correct the public record. None were honored.

84. For the period from December 16, 2024, through February 20, 2025, Oasis published the false statements with at minimum reckless disregard for their truth or falsity, having received detailed and repeated notice of the false statements through four independent channels while continuing to publish the false claims without correction. As set forth below, at least from

February 21, 2025 onward, Oasis published the false statements with actual knowledge of their falsity, documented in writing.

**F. February 2025: Hayden Confirms the Correct Math in Writing—Then Says Nothing for 15 Months**

85. Three weeks after claiming on the January 21, 2025 Zoom call that he did not understand the unit-conversion math, Hayden drafted the corrected per-serving lead calculation in writing. On February 12, 2025, at 10:53 AM, Hayden sent Murphy the following message via X direct message: "Would you agree with the following? Lead found in LMNT (6g packet) = 0.162 µg/serving. Legal limit = 2.2 µg/day for children and 8.8 µg/day for childbearing women. Health guideline = 0.5 µg/day."

86. On February 21, 2025, Murphy responded with two technical refinements: first, that the tested SKU was LMNT Raw Unflavored, a 3.5-gram packet rather than the 6-gram flavored packet that most of LMNT's other formulas contain, adjusting the correct per-serving figure to approximately 0.0945 micrograms; and second, that citations to regulatory limits should specify the applicable authority, as California Proposition 65 and federal EPA and U.S. Food and Drug Administration ("FDA") standards differ. Hayden did not contest either refinement. By February 21, 2025, Hayden had personally drafted the corrected math and Murphy had refined it without objection from Hayden—leaving the parties in substantive agreement on the correct per-serving figure.

87. Following the parties' February 21, 2025 written exchange, Oasis made no further substantive communication to LMNT, took no steps to correct the false posts, and did not publish a retraction. The false statements remained live across all platforms—X, Instagram, YouTube, Facebook, Threads, and the Oasis App—continuously from December 16, 2024, through May 21, 2026, a period of approximately 17 months.

88. Also during this period, Oasis had broken two written commitments to review and update the LMNT listing and the oral commitment made on the January 21, 2025 Zoom call to publish a retraction. Despite these commitments, and despite the agreement reached on February 21, 2025, the Oasis App continued to display LMNT's score as 3/100, a score that Oasis had confirmed in writing, in February 2025, was based on incorrect unit-conversion math. Alongside the false and misleading 3/100 score was the claim that LMNT's products contained 93% of the daily value of lead. That figure is independently false and misleading for a separate reason: there is no FDA daily value for lead.

89. The false content continued to reach and influence consumers throughout this period. Consumers continued to encounter the false lead claims, and LMNT continued to receive direct outreach from consumers who had seen the posts and questioned the safety of its products. Oasis, meanwhile, continued to generate revenue through the Oasis App, including affiliate commissions on the product pages displaying the false LMNT scores.

90. From February 21, 2025 onward, Oasis published the false statements with actual knowledge of their falsity.

### G. May 2026: Oasis Finally Admits the Falsity of Its Statements—An Admission That Reached Just a Fraction of Those It Misled

91. The night before the misleading retraction, on May 20, 2026, Oasis published a post on social media identifying LMNT among the "Worst rated lab tested supplements in 2026," giving LMNT a score of 3/100, and listing LMNT as containing "93% lead." That is the same false figure that Oasis had confirmed in writing was incorrect in February 2025.




92. On May 21, 2026, after Murphy publicly called out Oasis's false lead claims and his posts were covered by trade press, Oasis published a partial but still misleading retraction across social media. The retraction stated in relevant part: "Correction: we posted inflated heavy metal contamination levels for LMNT electrolytes. A calculation error overstated lead, cadmium and arsenic per serving." Oasis then outlined the "[c]orrected amounts" for two LMNT products, admitting that both are "under the MADL." Oasis further stated: "We're adding review steps and bringing on more scientific and engineering support to reduce future mistakes."

93. The following day, on May 22, 2026, Hayden posted a more detailed admission under his personal account, which Oasis reposted, acknowledging the specific corrected figures for two LMNT products. Hayden stated, "[r]ecently we shared two inaccurate data listings with inflated heavy metal results for LMNT and Premier Protein. We have since deleted these posts to

stop the spread of inaccurate information and fixed the listings in our app. All of our efforts are committed to adding layers of verification for lab data, reviewing every product listing on Oasis and building out our team of scientists and engineers."[5]

94. In a direct message to trade press, Hayden stated: "our product grew faster than we could scale our QC process." This admission all but acknowledges that the product was operated without regard for the truth or falsity of the statements it published.

95. The eventual retraction was partial and inadequate. Oasis deleted the false social media posts but did not correct the 3/100 score for other LMNT products displayed on the Oasis App and oasishealth.app, describe the basis upon which the score was based, or provide relevant context for consumers to make informed choices. The revised per-serving lead figure published in the retraction—0.0773 micrograms per serving for LMNT Citrus Salt—was derived using the same unit-conversion methodology that Oasis's own founder had confirmed in writing was correct in February 2025. Oasis waited 15 months to apply a methodology it had known to be correct since February 2025.

96. The retraction reached a fraction of the audience exposed to the original false posts. The original posts generated tens of thousands of likes and millions of views across platforms. The misleading retraction generated minimal engagement on other platforms. The asymmetry between the reach of the false claims and the reach of the correction is itself a measure of the ongoing harm to LMNT.

97. Even with heavy metals numbers accurately reported—which in this case show a 6,460x margin of safety below levels California has established that do "not pose any harm to

[5] On Threads, Oasis also admitted the calculation error concerning Premier Protein: "We got the Premier Protein numbers wrong previously. A calculation error inflated the heavy metals."

humans or laboratory animals," Oasis lists prominently next to LMNT in bright orange callouts "4 Harmful substances" and features heavy metals is if they are the primary ingredients in the product. For context, testing shows that a salad with leafy greens, rice, and some nuts will tend to have between four to ten times more trace amounts of lead than the Prop 65 standard, and in this case, 28 to 70 times more lead than the referenced LMNT product.

**H. After Oasis's Admission, the False Scores and Characterizations Remain**

98. Following the May 21 and 22 partial retractions, Oasis published new content about LMNT on oasishealth.app, including listing LMNT Citrus Salt on the list of "Heavy Metals Test 2026" and a "PFAS Test 2026." The publication of new purported test results about LMNT after the retraction establishes that Oasis has not ceased its defamatory campaign against LMNT and instead chooses to continue it.

99. The false content on oasishealth.app remains indexed by search engines and accessible to consumers researching LMNT's products. Consumers who encounter this content are presented with scores and figures that Oasis has publicly admitted are the product of inflated and inaccurate data, without any correction or retraction on the pages where that content appears.

100. As of the date of this filing, Oasis continues to publish false and misleading content about LMNT on oasishealth.app. The Oasis App describes lead—present in LMNT's products at 0.1457 micrograms per serving, approximately 29% of the California Proposition 65 MADL—as "toxic to multiple organ systems." Oasis assigns it a score of -5.0 out of 5.0 (listed as "Very bad" on Oasis's sliding scale), describing its risks as "neurotoxicity, developmental toxicity, kidney damage, cardiovascular effects, carcinogenicity, and cumulative toxicity," and its benefits as "None." These characterizations are false and misleading as applied to lead at the per-serving levels present in LMNT's products, which fall well within applicable safety thresholds and pose no cognizable health risk to consumers.

### I. Oasis's Conduct Toward LMNT Is Part of a Broader Pattern

101. Oasis's conduct toward LMNT is not an isolated incident; it is part of a pattern and practice of publishing false and alarming claims without any investigation into their truth, for the purpose of garnering revenue and publicity for the app. Public records establish that Oasis received cease-and-desist demands from several other consumer brands on substantially similar grounds, and that Oasis made false statements against multiple other brands before and after targeting LMNT.

102. In August 2025, Primo Brands, the parent company of Mountain Valley Spring Water, sent Oasis a cease-and-desist letter through counsel at Alston & Bird LLP demanding removal of false posts about Mountain Valley products. Rather than comply, Hayden displayed the letter on camera and characterized the demand as an attempt by "big water" to silence him.

103. In mid-2025, PepsiCo's legal team sent Oasis a cease-and-desist demand concerning false posts about Celsius and Alani energy drinks, which Hayden has publicly admitted on camera. In both instances, Oasis received formal legal notice that its posts contained false statements and chose to continue its conduct.

104. The pattern extends beyond cease-and-desist recipients. Multiple consumer brands have publicly challenged the accuracy of Oasis's product scoring. Dr. Anthony Gustin, the founder of Lineage Foods and Equip Foods, publicly documented what he described as "over 100 egregious examples" of inaccurate scoring across the Oasis App, including products scored lower than Lay's potato chips, Oreo cookies, and Cheeto Puffs despite having objectively cleaner ingredient profiles. Angel Acres, Based, and Sport Drink have similarly raised public objections to Oasis's scoring of their products.

105. Oasis's false lead claims were not limited to LMNT. On May 19, 2026—the same week that Oasis was forced to retract its false statements about LMNT—Oasis published a

coordinated series of posts across social media falsely claiming that "toxic heavy metals" had been detected in 70% of protein powders tested, listing Premier Protein at "3116% lead" and Transparent Labs at "461% lead." The posts reached 3.5 million views on X alone within 24 hours.




106. The figures were false for the same reason that the LMNT figures were false. Oasis falsely applied bulk concentration figures expressed in parts per billion against per-serving regulatory thresholds, even though the Consumer Reports table that Oasis relied on displayed the correct per-serving figures in micrograms directly alongside the parts-per-billion readings. The study that Oasis purported to cite showed Premier Protein's actual per-serving lead dose at 0.380

micrograms—below the California Proposition 65 MADL of 0.5 micrograms per serving. Oasis overstated the figure by a factor of more than 300. For Transparent Labs, the underlying data showed a per-serving lead dose of 0.43 micrograms—also below the MADL. Oasis reported it as 461% of the lead limit.

CR Consumer Reports

JANUARY 2026

TEST RESULTS

## Heavy Metals in Protein Supplements

CR tested these 5 protein powders for arsenic, cadmium, lead, and mercury. The products are listed in alphabetical order. The values for arsenic, cadmium, and lead are given in micrograms (mcg) for one serving of the product and in parts per billion (ppb). We did not test for inorganic arsenic because our test results for total arsenic did not exceed our level of concern. Mercury was not detected at or above levels of concern in any of the products. All results are averages from the two or three lots tested for each product. "NT" stands for "not tested" and "ND" stands for "not detected."

| Product | Serving Size (g) | Test Results | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total arsenic, mcg | Total arsenic, ppb | Total inorganic arsenic, mcg | Total inorganic arsenic, ppb | Cadmium, mcg | Cadmium, ppb | Lead, mcg | Lead, ppb | Mercury, mcg | Mercury, ppb |
| Clean Simple Eats Protein Powder, Chocolate Brownie Batter | 34 | 0.17 | 5.1 | NT | NT | 1.047 | 30.8 | 0.205 | 6.0 | 0.010 | 0.29 |
| Equate Whey Protein Powder, Rich Chocolate | 30.4 | 0.19 | 6.3 | NT | NT | 0.217 | 7.1 | 0.268 | 8.8 | 0.016 | 0.53 |
| Premier Protein Protein Powder, Chocolate Milkshake | 41 | 0.18 | 4.4 | NT | NT | 0.649 | 15.8 | 0.380 | 9.3 | ND | ND |
| Ritual Essential Protein Daily Shake, Chocolate | 33 | 0.37 | 11.2 | NT | NT | 1.944 | 58.9 | 0.525 | 15.9 | 0.011 | 0.33 |
| Truvani Plant-Based Protein, Chocolate | 33 | 0.48 | 14.6 | NT | NT | 3.270 | 99.1 | 0.455 | 13.8 | 0.025 | 0.76 |

107. On May 20, 2026—the same day Oasis published its "Worst rated lab tested supplements in 2026" post featuring LMNT prominently—Hayden publicly celebrated what he called "oasis record day," posting App Store analytics showing a dramatic spike in app use and Oasis ranking in the top ten health apps in the App Store. The connection was direct: false and alarming claims about popular consumer brands drove record downloads and revenue—the same dynamic that Oasis had exploited with LMNT.







108. Murphy publicly called out the protein posts within hours, posting that the claims were "totally bogus" and attaching the underlying Consumer Reports data showing test results in fact under the Prop 65 limit. Oasis issued a partial correction on May 21, 2026—the same day that Oasis retracted the LMNT posts—acknowledging that "a calculation error overstated lead and cadmium per serving" for Premier Protein. That correction reached a small fraction of consumers who had seen the original false claims. Oasis did not correct its false figures for the other brands that it had maligned.







### J. Oasis's Scores Are Arbitrary, Internally Inconsistent, and Not Backed by Science

109. Oasis's false scoring of LMNT is not an outlier—it is a symptom of a scoring system that is arbitrary, commercially motivated, and inconsistent with any legitimate science-based methodology. LMNT, a clean-label electrolyte product with no sugar, no artificial sweeteners, and no seed oils, was assigned a score of 3/100 on the Oasis App. During the same period, Oasis assigned Snapple Peach Tea a score of 90/100, Cheeto Puffs a score of 58/100, and Pillsbury Lucky Charms Sugar Cookie Dough a score of 52/100. Oasis further assigned Mike's Hard Lemonade a score of 81/100, claiming it has zero harmful substances and six beneficial ingredients, "Monster The Beast Hard Pink Poison" a score of 70/100, despite having zero beneficial ingredients and three harmful substances, and Miller High Life a score of 81/100.










110. LMNT's direct competitor Re-Lyte Hydration, which has a nearly identical ingredient profile, was assigned a score of 52/100—17 times LMNT's score. No legitimate health-based scoring methodology produces these results.

111. Oasis's own methodology documentation is internally inconsistent. The scoring page on oasishealth.app simultaneously states that the final score equals a base score of either 90 or 100 minus material penalties, and separately that the base score is either 80 or 100—two irreconcilable formulas on the same page. The same ingredient, sucralose, is assigned four

different score values across different Oasis App listings. These inconsistencies further establish that Oasis's claim to publish scores "backed by verified lab data" is false.

112. Consumers who downloaded the Oasis App and relied on its scores did so because Oasis represented that those scores were the output of a specific, objective, science-based process. That representation was false. The scores Oasis assigned to LMNT and to other brands were not the output of a verified scientific process. They were arbitrary, commercially motivated, and presented to consumers under false pretenses.

**K. The Harm to LMNT**

113. As a direct and proximate result of Oasis's false and defamatory statements and conduct described in this Complaint, LMNT has suffered substantial harm to its reputation, brand, and business. The false lead claims were viewed by millions of consumers across Oasis's social media platforms and the Oasis App. Consumers who encountered the false content were falsely led to believe that LMNT's products posed serious health risks, causing lasting brand damage and causing consumers to avoid purchasing LMNT's products, to return products already purchased, and to warn others against purchasing them.

114. LMNT has also suffered lost sales, lost customers, and damage to its brand reputation. The ongoing publication of false scores and inflated lead figures on oasishealth.app continues to cause harm to LMNT on a daily basis, as consumers researching LMNT's products continue to encounter false information that Oasis has publicly admitted is inaccurate.

115. All conditions precedent to filing suit have been complied with and/or are waived.

## FIRST CLAIM FOR RELIEF[6]

### False Advertising — Lanham Act § 43(a), 15 U.S.C. § 1125(a)

116. LMNT incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

117. At all relevant times, Hayden personally committed, directed, and controlled the conduct alleged in this Count, both individually and in his capacity as sole Managing Member of Live Oasis, LLC.

118. LMNT has standing to bring this claim. LMNT has a reasonable interest in being protected against Oasis's false advertising of its products, and a reasonable basis for believing that interest has been and will continue to be damaged by Oasis's conduct. Oasis's false statements about the lead content of LMNT's products directly targeted LMNT by name, reached millions of consumers, and caused lost sales and damage to LMNT's business reputation.

119. Oasis's posts, in-app product scores, and website content constitute commercial advertising or promotion within the meaning of the Lanham Act. Oasis operates a commercial platform that generates revenue through app subscriptions and affiliate commissions. Oasis's posts about LMNT were designed to drive consumer traffic to the Oasis App, increase app downloads, and generate affiliate revenue by steering consumers away from LMNT's products and toward competing products from which Oasis profits. The false statements were disseminated widely and repeatedly to the relevant purchasing public across X, Instagram, YouTube, Facebook, Threads, and the Oasis App. Oasis has publicly acknowledged that controversial content drives app downloads on multiple occasions. For example, on December 15, 2024, Oasis posted App Store analytics showing a 66% download spike the day before publishing the false LMNT posts in

[6] Each claim for relief is asserted against both Defendants Live Oasis, LLC and Cormac Hayden.

December 2024. And on May 20, 2026, Oasis publicly celebrated a "record day" for downloads, the same day Oasis published false statements that LMNT contained 93% lead alongside its false protein posts. Moreover, each individual product score displayed to a consumer on the Oasis App constitutes a promotional presentation within the meaning of the Lanham Act, regardless of the breadth of its distribution.

120. Oasis made false and misleading statements of fact about LMNT's products. Specifically, on December 16, 2024, Oasis published posts across at least five social media platforms and the Oasis App falsely asserting that LMNT's products contained "seven times the recommended limit" of lead, that "[t]ests revealed 27 ppb of lead in LMNT's unflavored options," and that lead in LMNT's products causes cognitive impairment and developmental harm. These statements are false. The figure Oasis cited, 27 ppb, reflects a bulk concentration measurement, not a per-serving dose. Correctly converted, the per-serving lead dose in LMNT's products is approximately 0.0945 micrograms, representing approximately 19% of the California Proposition 65 MADL. Oasis's own founder confirmed these correct figures in writing on February 12, 2025.

121. Oasis's claim that lead at the levels present in LMNT's products causes cognitive impairment and developmental harm is independently false and misleading. The health effects Oasis attributed to lead are associated with chronic exposure at levels orders of magnitude higher than those present in LMNT's products. LMNT's per-serving lead content falls well below the California Proposition 65 MADL. To associate a product testing at a fraction of that threshold with cognitive impairment and developmental harm is not a scientific characterization. It is a false statement of fact.

122. As set forth above, Oasis republished materially similar false and misleading statements about LMNT as recently as May 20, 2026, stating that LMNT was among the "Worst

rated lab tested supplements in 2026," constituting separate and independent acts of false advertising.

123. Oasis further represents on oasishealth.app and on the Oasis App's LinkedIn page that the platform is "backed by verified lab data" and that "everything on Oasis is backed by science." These representations are false and misleading. As of the date of this filing, Oasis was actively recruiting for a Head of Lab Testing—the role that would own the end-to-end testing pipeline—establishing that upon information and belief no such function existed during the period the false LMNT content was published.

124. Independently of the false statements about LMNT's products, Oasis's representations about its own scoring methodology constitute false and misleading statements in commercial advertising. Oasis represented to consumers that its scores are derived from a consistent, objective, science-based methodology backed by verified lab data. That representation is literally false. As set forth above, Oasis's published methodology documentation contains irreconcilable internal contradictions, the same ingredient is assigned materially different score values across different product listings, and the scoring outcomes are inconsistent with any objective health-based analysis. Consumers who relied on Oasis's scores—and who avoided purchasing LMNT's products as a result—did so based on a false representation about the nature of Oasis's scoring process, not merely about LMNT's products. These misrepresentations are material: a consumer who understood that Oasis's scores were arbitrary and did not follow any consistent methodology would not rely on them in making purchasing decisions.

125. Oasis's false and misleading statements had at least a tendency to deceive a substantial portion of their intended audience. The posts received thousands of likes and hundreds of thousands or more views across platforms. Consumers who read the posts were falsely led to

believe that LMNT's products posed serious health risks. LMNT received direct consumer outreach from individuals, including pregnant and breastfeeding users, who had encountered the false claims and questioned the safety of LMNT's products. Multiple third-party commenters publicly expressed concern about the health risks described in Oasis's posts.

126. Oasis's misrepresentations were material. False claims that a consumer product contains dangerous levels of a toxic heavy metal are precisely the kind of statements likely to influence purchasing decisions. A reasonable consumer who believed that LMNT's products contained seven times the recommended limit of lead would not purchase those products.

127. Oasis's goods and services travel in interstate commerce. The Oasis App is available for download nationwide on the Apple App Store and Google Play. Oasis's social media posts were accessible and accessed by consumers across the United States. LMNT's products are sold nationwide.

128. Oasis's conduct has caused and is likely to continue to cause injury to LMNT in the form of lost sales, lost customers, damage to business reputation, and loss of goodwill. The false content remains accessible on Oasis's platforms as of the date of this filing, continuing to cause harm.

129. As a result of Oasis's violations of the Lanham Act, LMNT is entitled to recover Oasis's profits, damages sustained by LMNT, the costs of this action, and attorneys' fees pursuant to 15 U.S.C. § 1117(a), as this is an exceptional case. LMNT is further entitled to injunctive relief pursuant to 15 U.S.C. § 1116.

## **SECOND CLAIM FOR RELIEF**

### **Defamation**

130. LMNT incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

131. At all relevant times, Hayden personally committed, directed, and controlled the conduct alleged in this Count, both individually and in his capacity as sole Managing Member of Live Oasis, LLC.

132. Oasis's posts published on December 16, 2024, across X, Instagram, YouTube, Facebook, Threads, and the Oasis App falsely asserted that LMNT's products contained seven times the recommended limit of lead and posed serious health risks including cognitive impairment and developmental harm. These statements are false statements of fact, not expressions of opinion. They are objectively verifiable—and verifiably false—as demonstrated by Oasis's own founder in writing in February 2025 and again on May 21-22, 2026.

133. Oasis published these statements to thousands and ultimately millions of third parties across multiple platforms. The posts received thousands of likes and hundreds of thousands of views. Oasis's social media accounts collectively reach hundreds of thousands of followers. The false statements were further amplified by third-party accounts, compounding the breadth of publication.

134. The statements refer specifically and unambiguously to LMNT and its products. Oasis named LMNT by name in each post and identified specific LMNT product lines. Each product page on the Oasis App displaying the false lead figures is individually attributed to LMNT by product name and brand.

135. Third parties who read Oasis's posts understood them to convey that LMNT's products contained dangerous levels of a toxic heavy metal posing serious health risks. Consumers who encountered the posts expressed concern about the safety of LMNT's products, contacted LMNT directly with safety questions, and in some cases indicated they would stop purchasing LMNT's products as a result.

136. Oasis's statements constitute defamation because they malign LMNT in its trade and business. False claims that a consumer food product contains dangerous levels of a toxic heavy metal go to the core of that product's commercial viability and directly impugn the safety and quality of LMNT's business operations and products.

137. Oasis published the false statements with actual malice. On February 12, 2025, Hayden personally drafted the corrected per-serving lead math in writing via X direct message to Murphy. On February 21, 2025, the parties reached written agreement on the corrected figures. From that date forward, Oasis published and maintained the inflated lead figures and the 3/100 score with actual knowledge that those figures were false.

138. Prior to February 21, 2025, Oasis published the false statements with at minimum reckless disregard for their truth or falsity, having received detailed notice of the false statements through four independent channels—including a public correction by Murphy on December 16, 2024, a sustained direct message thread, a one-hour Zoom call, and formal written outreach from LMNT's General Counsel—while continuing to publish the false claims without correction.

139. Oasis's actual malice is further evidenced by its republication of the same false lead figures on May 20, 2026, constituting separate and independent acts of defamation published with actual knowledge of their falsity.

140. Oasis's LMNT score was defamatory by implication because it falsely signaled to users that the product was unsafe to consume.

141. As a direct and proximate result of Oasis's defamatory statements, LMNT has suffered substantial injury to its reputation, brand, and business, including lost sales, lost customers, and damage to its goodwill, in an amount to be proven at trial.

142. Because Oasis acted with actual malice, LMNT is further entitled to an award of punitive damages.

**THIRD CLAIM FOR RELIEF**

**Trade Libel / Injurious Falsehood**

143. LMNT incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

144. At all relevant times, Hayden personally committed, directed, and controlled the conduct alleged in this Count, both individually and in his capacity as sole Managing Member of Live Oasis, LLC.

145. Delaware recognizes a cause of action for trade libel, also known as injurious falsehood. A defendant is liable for injurious falsehood where it intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and knows that the statement is false or acts in reckless disregard of its truth or falsity.

146. Oasis knowingly or recklessly published false statements about LMNT's products. The posts published on December 16, 2024, falsely asserted that LMNT's products contained dangerous levels of lead, specifically that LMNT's products contained seven times the recommended limit. These statements are false. As established herein, Oasis's own founder confirmed in writing on February 12, 2025, that the correct per-serving lead figure was a fraction of the applicable regulatory thresholds, and both parties reached written agreement on the corrected figures on February 21, 2025. From that date forward, Oasis published the inflated figures with actual knowledge of their falsity. Prior to February 21, 2025, Oasis published the false

statements with reckless disregard for their truth or falsity, having received detailed and repeated notice of the false statements through four independent channels.

147. Oasis also republished the same false figures as recently as May 20, 2026, constituting separate and independent acts of trade libel published with actual knowledge of their falsity.

148. Oasis published the false statements with the intent to cause LMNT financial loss, or at minimum recognized or should have recognized that the statements were likely to cause such loss. Oasis operates a commercial platform that monetizes through affiliate commissions on competing products. Oasis had a direct financial incentive to suppress LMNT's scores and drive consumers toward competing products from which Oasis profits. Oasis's own public statements establish that it understood controversial content about consumer products drives app downloads and affiliate revenue. The false lead claims about LMNT were published the day after Oasis publicly posted App Store analytics showing downloads had spiked attributable to controversial social media content.

149. Oasis's false statements about the safety of LMNT's products were directed specifically at LMNT's commercial interests. False claims that a consumer food product contains dangerous levels of a toxic heavy metal are precisely the type of statements calculated to cause consumers to stop purchasing that product and to purchase competing products instead.

150. As a direct and proximate result of Oasis's false statements, LMNT has suffered actual pecuniary loss, including lost sales, lost customers, and damage to its business and commercial relationships, in an amount to be proven at trial. The false content continues to appear on Oasis's platforms as of the date of this filing, causing ongoing pecuniary harm to LMNT.

**FOURTH CLAIM FOR RELIEF**

**Tortious Interference with Prospective Economic Advantage**

151. LMNT incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

152. At all relevant times, Hayden personally committed, directed, and controlled the conduct alleged in this Count, both individually and in his capacity as sole Managing Member of Live Oasis, LLC.

153. LMNT had reasonably probable business opportunities with existing and prospective customers and partners in the electrolyte and sports nutrition market. LMNT has an established national customer base of health-conscious consumers who purchase LMNT products on a regular and recurring basis. LMNT also had reasonably probable business opportunities with prospective customers and partners actively researching electrolyte products—a consumer population that Oasis's platform specifically targets and to whom Oasis specifically disseminated the false lead claims. LMNT further had reasonably probable business opportunities with retail and distribution partners whose purchasing and stocking decisions are influenced by consumer perception of product safety.

154. Oasis intentionally interfered with these business opportunities. Oasis published false claims that LMNT's products contained dangerous levels of lead—statements calculated to cause consumers to stop purchasing LMNT's products and to cause retail and distribution partners to question their relationship with LMNT. Oasis's commercial motive for interfering is established by the record: Oasis earns affiliate commissions on competing products and had a direct financial interest in diverting consumers away from LMNT. Oasis's own public statements confirm that it understood that controversial content about consumer products drives app downloads and

generates revenue. Oasis published the false LMNT posts the day after publicly celebrating a download spike attributable to such content.

155. Oasis's interference was wrongful independent of the interference itself. The conduct alleged herein constitutes defamation, trade libel, and false advertising under the Lanham Act.

156. Oasis's interference directly caused injury to LMNT. For example, a prospective sponsorship partner declined to move forward with LMNT after its team encountered Oasis's false lead claims and cited those claims as the reason for withdrawal. Further, consumers who encountered the false lead claims contacted LMNT to express concern about product safety and indicated that they would stop purchasing LMNT's products. The false claims reached millions of consumers across Oasis's platforms and through third-party amplification, driving a material portion of LMNT's existing and prospective customer base to question the safety of LMNT's products. The false content remains accessible as of the date of this filing, continuing to interfere with LMNT's prospective business relationships.

157. As a direct and proximate result of Oasis's tortious interference, LMNT has suffered damages including lost sales, lost customers, and harm to existing and prospective business relationships, in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### Delaware Deceptive Trade Practices Act, 6 *Del. C.* § 2531 *et seq.* and Delaware Common Law

158. LMNT incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

159. At all relevant times, Hayden personally committed, directed, and controlled the conduct alleged in this Count, both individually and in his capacity as sole Managing Member of Live Oasis, LLC.

160. The Delaware Deceptive Trade Practices Act ("DTPA") prohibits deceptive trade practices occurring in the course of a business, vocation, or occupation. Specifically, 6 *Del. C.* § 2532(a)(8) prohibits disparaging "the goods, services, or business of another by false or misleading representation of fact," and § 2532(a)(12) prohibits conduct that "similarly creates a likelihood of confusion or of misunderstanding." The DTPA codifies Delaware's common law of unfair competition but does not displace it. 6 *Del. C.* § 2532(c). LMNT's claims are cognizable under both the statute and Delaware common law.

161. Oasis engaged in deceptive trade practices in the course of its business. Oasis operates the Oasis App as a commercial enterprise, generating revenue through app subscriptions and affiliate commissions. The false statements about LMNT's products were published in the course of that business, on Oasis's commercial platform and affiliated social media accounts, as part of Oasis's content strategy for driving app downloads and affiliate revenue.

162. Oasis disparaged LMNT's goods and business by false and misleading representations of fact and engaged in conduct creating a likelihood of confusion and misunderstanding among consumers. Oasis falsely represented that LMNT's products contained seven times the recommended limit of lead and posed serious health risks including cognitive impairment and developmental harm. Oasis republished materially similar false figures as recently as May 20, 2026, the night before its partial and misleading retraction, constituting separate and independent deceptive trade practices committed with actual knowledge of their falsity. These

representations are false statements of fact, not opinions or puffery. They are objectively verifiable and verifiably wrong, as Oasis's own founder confirmed in writing in February 2025.

163. Oasis further represents that the Oasis App is "backed by verified lab data"—a false and misleading representation that deceives consumers into believing Oasis's product scores, including the false scores assigned to LMNT's products, rest on a reliable scientific foundation.

164. Independently, Oasis's representations to consumers that its scores are derived from a consistent, objective, science-based methodology constitute false and misleading representations of fact within the meaning of 6 *Del. C.* § 2532(a)(8) and conduct creating a likelihood of confusion or misunderstanding within the meaning of § 2532(a)(12). Oasis's published methodology documentation is internally contradictory, the same ingredient is assigned materially different score values across different listings, and the scoring outcomes are inconsistent with any legitimate health-based analysis. Consumers who relied on Oasis's scores as the output of a verified scientific process were misled about the fundamental nature of the platform they trusted.

165. Oasis's deceptive trade practices are willful. As established herein, Oasis maintained the false statements about LMNT for 15 months after Oasis's own founder confirmed in writing that they were incorrect. Oasis published the same false lead figures the night before its own partial and misleading retraction—an act that exemplifies the willfulness of its conduct. Oasis's continued publication of false content about LMNT after the May 2026 partial retraction further establishes willfulness.

166. LMNT is a person likely to be damaged by Oasis's deceptive trade practices within the meaning of 6 *Del. C.* § 2533. LMNT has suffered and continues to suffer harm to its business,

reputation, and goodwill as a direct result of Oasis's false and misleading representations about its products.

167. Pursuant to 6 *Del. C.* § 2533, LMNT is entitled to injunctive relief enjoining Oasis from continuing to engage in deceptive trade practices, including the continued publication of false and misleading statements about LMNT's products. LMNT is further entitled to an award of attorneys' fees given Oasis's willful engagement in deceptive trade practices.

## SIXTH CLAIM FOR RELIEF

### Unfair Competition — California Business & Professions Code § 17200 *et seq.*

168. LMNT incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

169. At all relevant times, Hayden personally committed, directed, and controlled the conduct alleged in this Count, both individually and in his capacity as sole Managing Member of Oasis.

170. California Business & Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business practice. The conduct giving rise to this claim originated in California, where Hayden resides and from which he operates the Oasis App and its associated social media accounts. Hayden published the false statements about LMNT from Santa Monica, California. As a result of that California-based conduct, LMNT suffered harm including the loss of California customers and California revenue.

171. Oasis's conduct constitutes an unlawful business practice. The false statements published by Oasis violate the Lanham Act, constitute defamation and trade libel under Delaware law, and constitute deceptive trade practices under the Delaware DTPA.

172. Oasis's conduct constitutes an unfair business practice. Oasis published false and sensational health claims about a competitor's products for the purpose of driving consumer traffic to its own platform and generating affiliate revenue from competing products. This conduct significantly threatens and harms competition by suppressing consumer demand for LMNT's products through false and misleading safety claims while commercially benefiting Oasis at LMNT's expense. The gravity of the harm to LMNT—false claims of dangerous lead contamination reaching millions of consumers—far outweighs any legitimate utility in Oasis's conduct.

173. Oasis's conduct constitutes a fraudulent business practice. The false claims that LMNT's products contained seven times the recommended limit of lead, and its false statements that LMNT contains levels of lead that are "toxic to multiple organ systems," published across at least five social media platforms and the Oasis App, were likely to deceive and continue to deceive members of the public into believing that LMNT's products posed serious health risks. Oasis republished materially similar false figures as recently as May 20, 2026, constituting separate and independent fraudulent business practices committed with actual knowledge of their falsity. Oasis's representation that the Oasis App is "backed by verified lab data" further deceives consumers into believing that the false product scores published by Oasis rest on a reliable scientific foundation.

174. LMNT has suffered injury in fact and has lost money and property as a result of Oasis's unfair, unlawful, and fraudulent business practices, including lost sales, lost customers, and damage to its business reputation, within the State of California and nationwide.

175. Pursuant to California Business & Professions Code § 17203, LMNT is entitled to injunctive relief enjoining Oasis from continuing to engage in the unlawful, unfair, and fraudulent

business practices alleged herein, and to restitution of money acquired by Oasis by means of its unfair competition.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all issues deemed to be triable by a jury.

## PRAYER FOR RELIEF

Plaintiff Drink LMNT, Inc. respectfully requests that this Court enter judgment in its favor and against Defendants Live Oasis, LLC and Cormac Hayden, jointly and severally, and grant the following relief:

A. A permanent injunction requiring Oasis to remove all false and defamatory content about LMNT and its products from the Oasis App, oasishealth.app, and all social media accounts operated by Oasis or under Oasis's control, including but not limited to all false product scores, false lead figures, and false safety characterizations;

B. A permanent injunction requiring Oasis to publish corrective statements in a form and manner approved by this Court, reasonably calculated to reach the audience exposed to the original false statements, on each platform and account through which the false statements were published;

C. A permanent injunction enjoining Oasis from publishing, republishing, or disseminating any further false or misleading statements about LMNT, its products, or the safety of its products;

D. Compensatory damages in an amount to be proven at trial;

E. Disgorgement of Oasis's profits attributable to the false advertising alleged herein, pursuant to 15 U.S.C. § 1117(a);

F. Punitive damages in an amount commensurate with the knowing, deliberate, and malicious nature of Oasis's conduct;

G. Restitution of money acquired by Oasis through its unfair competition, pursuant to California Business & Professions Code § 17203;

H. Attorneys' fees pursuant to 15 U.S.C. § 1117(a) and 6 *Del. C.* § 2533;

I. Costs of suit;

J. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

K. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Michael A. Barlow*
Michael A. Barlow (#3928)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
500 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com

*Attorneys for Plaintiff*

OF COUNSEL:

Alex Spiro
Renita Sharma
Michael Bloom
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7000

Cory Wroblewski
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
3100 McKinnon St., #1125
Dallas, Texas 75201
(469) 902-3600

Dated: June 10, 2026